**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **ALAN MCFETRIDGE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:06CV36 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying Alan McFetridge's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Complaint. (Document Number 20). Defendant has filed a Brief in Support of the Answer. (Doc. No. 21). Plaintiff has also filed a Reply. (Doc. No. 24).

## Procedural History

On February 17, 2004, plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income, claiming that he became unable to work due to his disabling

_____

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action. See Fed.R.Civ.P. 25(d)(1).

condition on October 1, 2001.[2]  (Tr. 111-13, 371-74).  Plaintiff's claims were denied initially, and

following an administrative hearing, plaintiff's claims were denied in a written opinion by an

Administrative Law Judge (ALJ), dated October 6, 2005.  (Tr. 100, 103-07, 375-80).  Plaintiff

then filed a request for review of the ALJ's decision with the Appeals Council of the Social

Security Administration (SSA), which was denied on January 6, 2006.  (Tr. 11, 7-9).  Thus, the

decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981,

416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on August 29, 2005.  (Tr. 35).  Plaintiff was

present and was represented by counsel.  (Id.).  The ALJ began the hearing by admitting the

exhibits into the record.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he was 42 years of age.  (Tr.

36).  Plaintiff stated that he last worked on October 1, 2001, delivering newspapers.  (Id.).

Plaintiff testified that he graduated from high school and that he has not received any specialized

training.  (Tr. 37).  Plaintiff stated that he is able to read, write, add, subtract, multiply, divide,

make change, and tell time.  (Id.).  Plaintiff testified that he is five-feet, six-inches tall and weighs

about 198 pounds.  (Id.).

Plaintiff stated that he has been in nine automobile accidents since 1976.  (Id.).  Plaintiff

testified that the last accident in which he sustained injuries occurred on August 1, 1990.  (Id.).

---

[2]As the ALJ noted in his decision, plaintiff filed six previous applications for benefits, all of which were denied.  (Tr. 17, 51-94).

Plaintiff stated that he slipped a disc between the C-6[3] and C-7 vertebra[4] in that accident, for which he underwent surgical fusion.  (Tr. 38).  Plaintiff testified that he still experiences stiffness, pain, and limited mobility of the neck as a result of that injury.  (Id.).  Plaintiff stated that he occasionally experiences headaches along with these symptoms, although he indicated that the headaches were not significant.  (Id.).

Plaintiff testified that he has a herniated disc between the L-1[5] to the L-3 and in the T-3 region, and a non-union of C-1.  (Id.).  Plaintiff stated that he experiences stiffness across his shoulder blades.  (Tr. 39).  Plaintiff testified that he has numbness that runs down into both arms and into his fingers.  (Id.).  Plaintiff stated that he is unable to feel his fingers due to the numbness.  (Id.).  Plaintiff testified that the numbness is present about 90 percent of the time, and that he occasionally has difficulty holding onto things due to the numbness.  (Id.).

Plaintiff testified that he has scoliosis,[6] which causes him to experience pain in his lower and upper back that runs down into his hips and legs.  (Tr. 39-40).  Plaintiff stated that this has been occurring since 1975, and that it has gotten worse since then.  (Tr. 40).  Plaintiff rated his back pain as an eight on a scale of zero to ten on an average day.  (Id.).

---

[3]Abbreviation for cervical vertebra (C1-C7).  Stedman's Medical Dictionary, 814 (27th Ed. 2000).

[4]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[5]Abbreviation for lumbar vertebrae (L1 to L5).  Stedman's at 956.

[6]Abnormal lateral and rotational curvature of the vertebral column.  Stedman's at 1606.

Plaintiff testified that he has problems with his shoulders as a result of tendonitis.[7]  (Id.).
Plaintiff stated that his shoulder impairment contributes to the numbness in his hands.  (Id.).

Plaintiff testified that he has suffered from depression.  (Id.).  Plaintiff stated that he was
not taking any medication for his depression at the time of the hearing because his doctor did not
believe that medication was helping him.  (Tr. 41).  Plaintiff testified that he experiences anxiety
attacks and depression.  (Id.).  Plaintiff stated that his last anxiety attack occurred about three
years prior to the hearing.  (Id.).

Plaintiff testified that he worked as a ranch hand from 1982 until June of 2001.  (Id.).
Plaintiff stated that his duties as a ranch hand included harvesting crops, fixing fences, moving
cattle, doctoring cattle, pulling calves, feeding cattle, and breaking horses.  (Id.).  Plaintiff testified
that he was required to lift between 100 to 150 pounds at this position.  (Id.).  Plaintiff stated that
he stopped working at this position in June of 2001 because his father, for whom he worked, laid
him off.  (Id.).  Plaintiff testified that he was laid off due to health problems he was experiencing,
mostly problems with his back, shoulders, and hips.  (Tr. 42).

Plaintiff stated that he also delivered newspapers during the time he was working as a
ranch hand.  (Id.).  Plaintiff testified that he started this position in 1989 and stopped working on
October 1, 2001.  (Id.).  Plaintiff stated that he delivered newspapers on a local route.  (Id.).
Plaintiff testified that he quit this position due to problems with his upper back and shoulders.
(Id.).  Plaintiff stated that he packaged the newspapers and then delivered them to boxes, from
which people bought them.  (Tr. 43).  Plaintiff testified that he was required to lift about 50
pounds at this position, which caused him to experience pain in his lower and upper back and

---

[7]Inflammation of a tendon.  Stedman's at 1794.

shoulders.  (Id.).

Plaintiff stated that he has been "taking it easy" and watching what he does to control his pain.  (Id.).  Plaintiff testified that he takes 1500 to 2000 milligrams of Equate, which is a generic form of Tylenol, once or twice a day.  (Id.).  Plaintiff stated that he has trouble sleeping at night.  (Id.).  Plaintiff testified that he occasionally experiences sharp pain in the hips when he sits.  (Id.).  Plaintiff stated that if he had a job where he could sit and perform assembly work, he would experience pain in his hips and low back.  (Tr. 44).  Plaintiff testified that the numbness in his arms and hands would also prevent him from working.  (Id.).

Plaintiff stated that he applied for a position at a local feed store but was not hired because there was no position available.  (Id.).

Plaintiff testified that he lifts 50 pounds about once a month, which causes him to experience pain in his upper back and shoulders the next day.  (Id.).  Plaintiff stated that he can lift 20 pounds without experiencing pain, although he indicated that he could not lift this amount of weight consistently.  (Tr. 45).  Plaintiff testified that he has hip and back pain when he turns from side-to-side.  (Id.).  Plaintiff stated that he occasionally experiences pain in his neck when he turns his head, although it does not bother him to look up or down.  (Id.).

The ALJ next examined plaintiff, who testified that he has been performing odd jobs for income.  (Id.).  Plaintiff stated that he performs tasks such as cleaning, taking out the trash, caring for dogs, and mowing the lawn, for a friend with whom he lives.  (Tr. 46).  Plaintiff testified that he earns about $50.00 a month.  (Id.).  Plaintiff stated that he is able to live on this income because he stays at his friend's house rent-free.  (Id.).  Plaintiff testified that he also receives food stamps.  (Id.).  Plaintiff stated that he received unemployment benefits beginning in the winter of

2002, through the next spring.  (Id.).

Plaintiff testified that he considers Dr. P. Rana his main doctor.  (Tr. 47).  Plaintiff stated that Dr. Rana has been his doctor for about eighteen months and that he sees him four to six times a year.  (Id.).  Plaintiff testified that he has a medical card.  (Id.).

Plaintiff's attorney then examined plaintiff's witness, Frank Scott, who testified that plaintiff lives with him and his wife.  (Id.).  Mr. Scott stated that he met plaintiff when plaintiff was dating Mr. Scott's daughter.  (Id.).  Mr. Scott testified that his daughter and plaintiff lived with him and his wife when they were dating.  (Tr. 48).  Mr. Scott stated that he and his wife allowed plaintiff to continue living with them after his daughter left because plaintiff had nowhere else to go.  (Id.).  Mr. Scott testified that plaintiff performs odd jobs for him such as taking care of the dogs and taking out the trash, in exchange for money and a place to stay.  (Id.).

Mr. Scott testified that he has observed plaintiff having trouble getting around.  (Id.).  He stated that plaintiff experiences pain when he mows the yard and that plaintiff has to lie down and rest for a couple days afterwards.  (Id.).  Mr. Scott testified that even though his yard is small, it sometimes takes plaintiff two or three days to mow it.  (Id.).  Mr. Scott stated that plaintiff also has problems lifting things.  (Id.).  He stated that plaintiff experiences pain when he tries to lift objects such as a small television or a bag of groceries.  (Tr. 49).  Mr. Scott testified that plaintiff had to stop and get out of the car during the drive to the hearing because he was experiencing pain.  (Id.).  Mr. Scott stated that plaintiff's depression often prevents him from getting out of the house and participating in activities.  (Id.).  Mr. Scott testified that plaintiff is no longer dating his daughter.  (Id.).

**B.** **Relevant Medical Records**

The record reveals that plaintiff presented to Wallowa County Mental Health Clinic on April 24, 1984, with complaints of significant depression, inappropriate social behavior, legal difficulties, and a need to rule out a thought process dysfunction. (Tr. 176-78). It was noted that plaintiff had been seen in the clinic on one prior occasion when he was in high school, due to difficulty he was having in a dating relationship. (Tr. 178). Plaintiff reported that he had been kicked out of college due to poor grades. (Id.). Plaintiff indicated that he "partied too much" and did not complete his work. (Id.). Plaintiff reported that he was employed as a hired hand for his father on the family's ranch. (Id.). Carol Rathbun, MS stated that plaintiff lacks appropriate social and interpersonal relationship skills, particularly with women. (Tr. 176). Plaintiff reported that he was very depressed and that he had had suicidal ideations, primarily related to an upcoming trial for a felony charge of possession of explosives. (Id.). Plaintiff presented himself as "somewhat slow" and it was recommended that plaintiff should perhaps be tested for intellectual ability. (Id.). Plaintiff had never attempted suicide. (Id.). Plaintiff stated that he occasionally worried about being crazy. (Id.). Ms. Rathbun's tentative diagnostic impression was: adjustment disorder[8] with mixed disturbance of emotions and conduct, rule out major

---

[8]Disorder whose essential feature is a maladaptive reaction to an identifiable psychological stress, or stressors that occurs within weeks of the onset of the stressors and persists for up to six months; the maladaptive nature of the reaction is indicated by impairment in occupational functioning or in usual social activities or relationships with others, or with symptoms that are in excess of a normal or expectable reaction to the stressor. See Stedman's at 525.

depression,[9] rule out a formal thought process disturbance; and rule out a personality disorder.[10] (Tr. 177). Ms. Rathbun indicated that plaintiff was presenting himself for individual counseling at the request of his father and that he would be evaluated by a psychiatrist for medication. (Id.).

Plaintiff presented to orthopedic surgeon Kenneth D. German on April 12, 1988. (Tr. 173-4). Plaintiff complained of sharp, localized back pain just above the belt region, predominantly on the right side. (Tr. 173). He also reported shooting pain in the leg, soreness underneath his shoulder blades, and a continuous feeling that his back is out of position. (Id.). Plaintiff indicated that he was working as a ranch hand, which required vigorous activity. (Id.). Plaintiff reported that he was involved in a motor vehicle accident on February 16, 1988, in which he sustained injuries, although he had experienced back and neck pain for a significant period prior to the accident. (Id.). Upon physical examination, plaintiff had good flexibility of his spine, he could touch his toes, and extend. (Id.). Plaintiff had good flexion and extension of the neck but was limited in rotation to the left of about 50 percent. (Id.). X-rays revealed scoliosis of his lumbar spine to the left in the high lumbar region, and to the right at L5-S1, with no evidence of fracture. (Id.). There was some evidence of degenerative changes at the facet joints. (Id.). Dr. German's impression was symptomatic scoliosis with synovitis[11] on the right lumbar area. (Id.).

_____

[9]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. See Stedman's at 478.

[10]A general term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control, and interpersonal functioning. Stedman's at 527.

[11]Inflammation of a joint. See Stedman's at 1773.

Dr. German recommended intermittent use of medication to reduce inflammation in the facet joint, a conditioning program to increase strength of the muscles, and stretching exercises. (Id.). Dr. German did not recommend surgery. (Id.). He prescribed Naprosyn.[12] (Id.).

On June 1, 1988, Dr. German reported that plaintiff was "generally improved," and that he was not experiencing the same severity of pain. (Tr. 174). Dr. German stated that plaintiff's scoliosis would likely present problems on a long-term permanent basis, including a higher chance for an osteoarthritic condition, and an imbalance problem. (Id.). Dr. German noted that plaintiff's actual injury was an aggravation of the scoliosis and that the injury resolved itself within a six to eight week period. (Id.). Dr. German recommended that plaintiff use a brace when he does a lot of lifting. (Id.). He noted that plaintiff was occasionally taking Naprosyn. (Id.).

On July 1, 1988, Dr. German stated that plaintiff's scoliosis and back strain would cause long-term permanent intermittent low back pain. (Id.). Dr. German recommended the intermittent use of the anti-inflammatory medication Naprosyn and the intermittent use of a brace. (Id.). He noted that plaintiff's condition would not require surgery unless he develops a herniated disc and has leg or arm symptoms. (Id.).

Plaintiff presented to Wallowa County Mental Health Clinic on September 12, 1988, for a court-ordered alcohol and drug evaluation after being convicted of furnishing alcohol to minors. (Tr. 180). Thomas J. Uchison, ACSW noted that plaintiff had been seen on and off in the Mental Health Clinic by Ms. Rathbun, but that plaintiff had never followed through with treatment recommendations. (Tr. 181). Mr. Uchison noted that Dr. Tunco, a consulting psychiatrist, felt

---

[12]Naprosyn is indicated for the treatment of osteoarthritis. See Physician's Desk Reference (PDR), 2632 (54th Ed. 2000).

that plaintiff had many features of a borderline personality disorder[13] along with antisocial features and had recommended antipsychotic medication but plaintiff refused medication.  (Id.).  Mr. Uchison's tentative diagnostic impression was chronic alcohol dependence; many features of borderline personality disorder and antisocial personality disorder;[14] and a Global Assessment of Functioning (GAF) score of 65.[15]  (Tr. 179).  Mr. Uchison summarized that plaintiff was "quite immature and socially inept."  (Id.).  He stated that plaintiff had a poor self image and had become psychologically dependent on alcohol to ease stress, worries, and angry affect.  (Id.).  Mr. Uchison recommended that plaintiff participate in an outpatient alcohol and drug program.  (Id.).  He noted that plaintiff will continue to experience problems with substance abuse and in terms of his manner of relating to society and he thus recommended additional mental health counseling or group counseling.  (Id.).

Plaintiff presented to the Mental Health Clinic for another court-ordered drug and alcohol evaluation on April 24, 1989, after receiving a DUI.  (Tr. 182-84).  The diagnostic impression of Shirley Sexton, MA was: chronic alcohol dependence; many features of borderline personality disorder and antisocial personality disorder; and a current GAF of 65.  (Tr. 183).  Ms. Sexton

---

[13]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, and inappropriate or uncontrolled affect.  See Stedman's at 526.

[14]An enduring and pervasive pattern characterized by continuous and chronic antisocial behavior with disregard for and violation of the rights and safety of others, beginning before the age of 15.  Stedman's at 525.

[15]A GAF score of 65 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Diagnostic and Statistical Manual of Mental Disorders 32 (4th Ed. 1994) ("DSM IV").

recommended residential drug and alcohol treatment. (Id.).

A radiology report performed on August 1, 1990 as a result of a motor vehicle accident noted a whole and nonuniting fracture, anterior arch of C1, and posterior arch of C1, which was thought to be congenital. (Tr. 199).

On August 7, 1990, plaintiff presented to neurologist Jennings C. Falcon II for an evaluation of right arm numbness following an automobile accident. (Tr. 250-52). Dr. Falcon's impression was significant multiple trauma to body, secondary to motor vehicle accident. (Tr. 252). He recommended that plaintiff undergo x-rays and other testing. (Id.). On August 9, 1990, Dr. Falcon noted that he had spoken with radiologist Dr. Bob Hanson, who indicated that the arches of plaintiff's top cervical vertebra were congenital and non-traumatic. (Tr. 253). Dr. Falcon stated that he phoned plaintiff to advise him of this information and told him that anything causing impact to the top of the head would be dangerous. (Id.).

Plaintiff presented to the Mental Health Clinic on February 7, 1991, at which time it was noted that plaintiff exhibited bizarre expressions to cover up his real feelings. (Tr. 189). The tentative diagnostic impression was: chronic alcohol dependence, in remission; borderline personality disorder; and rule out post traumatic stress disorder,[16] with childhood trauma. (Id.). It was recommended that plaintiff participate in counseling to get in touch with his feelings and to perhaps come to remember some childhood trauma. (Tr. 184).

Plaintiff underwent x-rays of the thoracic and lumbosacral spine on November 4, 1991.

---

[16]Development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria. Stedman's at 527.

(Tr. 201). Diffuse degenerative changes of a mild degree were found in the thoracic spine and a slight interval progression of degenerative changes were found at the T11-12 level. (Id.).

Plaintiff presented to the Mental Health Clinic on September 29, 1994, at which time he complained of anxiety, depression, and explosive anger. (Tr. 186). Plaintiff described his anxiety as 300 to 500 generalized anxiety attacks occurring in a variety of settings over a period of approximately four years. (Id.). Plaintiff indicated that he was taking Paxil[17] for his depression at that time. (Id.). Paul B. Spriggs-Flanders, MA, found no evidence of unusual psychomotor activity or psychotic thought processes, delusions, or hallucinations. (Tr. 188). Plaintiff was judged to be emotionally stable and his affect was appropriate. (Id.). He denied any thoughts of suicide. (Id.). Mr. Spriggs-Flanders' impression was: generalized anxiety disorder,[18] dysthymia,[19] and alcohol dependence in remission for five years. (Id.). Mr. Spriggs-Flanders recommended deep breathing exercises. (Id.).

Plaintiff underwent x-rays of the thoracic spine on January 11, 1995, which revealed a minimal increase in mild scoliosis of the thoracic spine, and mild degenerative changes that had not changed. (Tr. 203). Plaintiff also underwent x-rays of the lumbar spine, which revealed slight interval progression of discogenic degenerative changes. (Id.).

_____

[17]Paxil is an antidepressant indicated for the treatment of depression. See PDR at 3027-28.

[18]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features. Stedman's at 526.

[19]A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or over-eating, insomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness. Stedman's at 556.

- 12 -

The record reveals that plaintiff was seen at the Winding Waters Clinic thirty-five times from December 2001 to October 2003 for various complaints including back pain, hip pain shoulder pain, elbow pain, neck pain, difficulty sleeping, stomach pain, depression, cough, headache, muscle spasm, rash, and esophageal reflux. (Tr. 259-74). On December 6, 2001, plaintiff complained of back pain, elbow pain, shoulder pain, left hip pain and a reflux sensation. (Tr. 259). Upon physical examination, plaintiff exhibited good range of motion except abduction was difficult after 90 degrees. (Id.). Plaintiff was diagnosed with right shoulder tendonitis, lateral epicondylitis[20] right elbow, pain in the left buttock, lumbar spine DJD,[21] possible spinal stenosis,[22] and possible GERD.[23] (Id.). He was prescribed Celebrex.[24] (Id.). On December 14, 2001, plaintiff reported that his elbow, shoulder, and stomach were better. (Id.).

Plaintiff underwent x-rays of the lumbar spine on January 9, 2002, which revealed congenital scoliosis and degenerative lumbar spine changes, with no evidence of fracture or dislocation. (Tr. 208).

Plaintiff presented to Winding Waters Clinic on January 18, 2002, with complaints of

---

[20]Inflammation near the articular surface at the extremity of a bone. See Stedman's at 397, 603.

[21]Degenerative joint disease (DJD), or osteoarthritis, is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, resulting in pain or loss of function. See Stedman's at 1282.

[22]Narrowing of the spinal canal. See Stedman's at 1695.

[23]Gastroesophageal reflux disease (GERD), is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 514.

[24]Celebrex is indicated for the relief of the signs and symptoms of osteoarthritis. See PDR at 2335.

intense hip pain. (Tr. 260). Plaintiff was diagnosed with rotator cuff tendonitis in the right shoulder and was prescribed Ibuprofen and Flexeril.[25] (Id.). Plaintiff was given a shoulder injection on February 1, 2002. (Tr. 261). On February 21, 2002, plaintiff reported that the shoulder injection provided ten days of relief. (Id.). Plaintiff complained of hip pain and depression. (Id.). He was prescribed Paxil and it was recommended that he exercise and start physical therapy. (Tr. 262). On March 7, 2002, plaintiff complained of neck pain and was diagnosed with cervical spine strain. (Id.). On March 12, 2002, plaintiff reported that his moods had been better since he started taking Paxil, although he admitted that he did not take it every day as prescribed. (Id.). Plaintiff complained of a cough that had been occurring for over a year and had worsened. (Id.). Plaintiff complained of right hip pain on March 25, 2002 and on May 6, 2002. (Tr. 263). It was noted that chest x-rays that plaintiff had undergone were inconclusive due to poor inspiratory effort. (Id.). X-rays of his right hip were negative. (Id.). Plaintiff was diagnosed with right trochanteric bursitis,[26] right rotator cuff tendonitis, depression, congenital back deformities with scoliosis and DJD secondary, history of GERD, and persistent cough. (Tr. 264). On June 20, 2002, and July 8, 2002, plaintiff complained of abdominal discomfort. (Id.). Plaintiff was diagnosed with constipation and dyspepsia,[27] for which he was prescribed Metamucil. (Tr. 265). On September 18, 2002, plaintiff complained of neck and shoulder pain and headaches. (Tr. 266). Plaintiff's range of motion was decreased in all directions. (Id.). He

---

[25]Flexeril is indicated for the relief of muscle spasm associated with painful musculoskeletal conditions. See PDR at 1797.

[26]Trochanteric bursitis, or hip bursitis, is characterized by painful inflammation of the bursa over the outside of the thigh area. See Stedman's at 262, 1878.

[27]Upset stomach. See Stedman's at 554.

was diagnosed with cervical spine degenerative disease and mild right shoulder bursitis. (Id.).

Plaintiff underwent x-rays of his cervical spine on September 19, 2002, which revealed degenerative disc disease[28] of the lower cervical spine with cervical spondylosis[29] and DJD. (Tr. 226).

Plaintiff complained of right shoulder pain on October 8, 2002, at which time he was diagnosed with a likely old rotator cuff injury compounded by pain from plaintiff's cervical spine, and perhaps an element of bursitis in the right shoulder. (Tr. 266). Plaintiff was given a shoulder injection at that time, which he indicated provided relief. (Id.).

Plaintiff presented to the Mental Health Center for a mental health assessment in relation to his disability claim on October 10, 2002. (Tr. 193-96). Plaintiff reported that he intended to separate from and eventually divorce his current wife due to verbal and physical abuse he had suffered. (Tr. 193). Plaintiff indicated that he planned to secure a loan and then relocate to Missouri. (Id.). Plaintiff denied being depressed at that time but indicated that his medication was of benefit. (Tr. 196). He acknowledged occasional thoughts of suicide but reported that the thought of relocating to Missouri kept him from following through. (Id.). Plaintiff's thoughts regarding financial matters were described as not necessarily delusional but not reality-based, in that he believed that he could obtain unsecured loans without a stable income and despite his inability to do so on multiple other occasions. (Id.). The diagnostic impression was: adjustment disorder with anxiety and depression; alcohol dependence in full remission; mixed features of

---

[28]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See Medical Information Systems for Lawyers, § 6:201.

[29]Term for bony changes seen around the vertebral bones such as are found in degenerative disc disease. See Medical Information Systems for Lawyers, § 6:201.

developmental and personality disorders; arthritis in back and neck; bursitis of shoulders and hips; and a GAF of 35.[30]  (Tr. 197).

Plaintiff underwent x-rays of his right shoulder on November 3, 2002, and on March 12, 2003, which revealed possible rotator cuff impingement.  (Tr. 233, 235).

Plaintiff presented to Winding Waters Clinic on November 25, 2002, at which time he was diagnosed with chronic right shoulder pain, and possible rotator cuff impingement.  (Tr. 268).

Plaintiff presented to the Mental Health Center on December 5, 2002 for a psychiatric assessment.  (Tr. 190-92).  Dr. Terry Trudel indicated that plaintiff was experiencing very little depression at that time.  (Tr. 190).  Plaintiff reported boredom, which occurred in the context of being unemployed and having conflict with his wife.  (Id.).  Dr. Trudel described plaintiff's mood as satisfactory, and noted that plaintiff's presenting complaint was primarily connected with being bored.  (Tr. 191).  Plaintiff denied any suicidal thoughts or plans and did not exhibit evidence of psychotic process.  (Id.).  Dr. Trudel noted that a formal cognitive evaluation was not undertaken.  (Id.).  He indicated that the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) had been administered, which revealed a verbal IQ of 100 and a performance IQ of 78.  (Tr. 192).  Dr. Trudel noted that plaintiff's verbal comprehension index was better than 63 percent of adult males.  (Id.).  Dr. Trudel found that Paxil was working fairly well for plaintiff and that plaintiff did not present a lot of depressive symptomatology.  (Id.).  He stated that plaintiff's difficulties "lie more in the social realm, particularly in his relationship with his wife."  (Id.).  Dr. Trudel noted

---

[30]A GAF score of 35 indicates "some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work..)."  DSM IV at 32.

that plaintiff has been unrealistic at times about financial planning.  (Id.).  Dr. Trudel concluded that plaintiff's problems do not appear to be in the psychiatric realm in terms of having a major psychiatric diagnosis.  (Id.).  Dr. Trudel's diagnosis was: adjustment disorder with mixed emotional features secondary to conflict with wife; dysthymic disorder; alcohol abuse in remission; and multiple orthopedic problems.  (Id.).  He continued plaintiff on Paxil.  (Id.).

Plaintiff presented to Winding Waters Clinic on December 5, 2002, with complaints of intermittent back muscle spasms.  (Tr. 268).  He was diagnosed with chronic thoracic musculoskeletal strain.  (Id.).  It was recommended that plaintiff employ alternative methods of controlling his chronic pain, including yoga, meditation, exercise, acupuncture, and massage therapy.  (Id.).  He was prescribed Flexeril.  (Id.).  Plaintiff complained of shoulder pain that was keeping him awake at night on December 30, 2002, and again on January 20, 2003.  (Tr. 268-69).

Plaintiff saw orthopedic surgeon Gregg S. Densmore on January 30, 2003.  (Tr. 277).  Dr. Densmore discussed with plaintiff right shoulder arthroscopic acromioplasty,[31] and distal clavicle resection.  (Id.).  Plaintiff indicated that he wanted to proceed with surgery and the procedure was scheduled.  (Id.).

Plaintiff presented to Winding Waters Clinic for a complete physical examination on May 27, 2003.  (Tr. 270).  He indicated that his shoulder symptoms were stable at that time.  (Id.).  Plaintiff reported depression and difficulty sleeping although he did not have suicidal ideation.  (Id.).  The assessment of the examining physician was: GERD, and depression, currently stable.  (Id.).  Plaintiff was continued on his medications.  (Id.).  Plaintiff complained of right shoulder

---

[31]The surgical reshaping of the acromion, which is a part of the scapula (shoulder blade), to remedy compression of the rotator cuff joint.  See Stedman's at 18.

pain and muscle spasms in the lower back on June 5, 2003. (Tr. 271). The assessment of the examining physician was: GERD, eosinophilia,[32] chronic renal insufficiency, hyperlipidemia,[33] right shoulder impingement, and lower back pain. (Tr. 271-72). Plaintiff was continued on Flexeril for his intermittent muscle spasms. (Tr. 272). Plaintiff was treated for his GERD on July 2, 2003, and September 24, 2003. (Tr. 272, 273).

The record reveals that plaintiff was treated at the Washington University Clinic in August of 2003, although these records are illegible. (Tr. 286-93).

Plaintiff presented to the emergency room at Wallowa Memorial Hospital on September 6, 2003, for evaluation of right shoulder pain. (Tr. 245). It was noted that Dr. Densmore had performed surgery on plaintiff's right shoulder to remove a bone spur three weeks prior. (Id.). Upon physical examination, plaintiff's shoulder was found to be well-healed, with free abduction and rotation, and good range of motion. (Id.). Plaintiff was diagnosed with post-operative pain. (Id.). Physical therapy was recommended. (Id.). Plaintiff was prescribed Vicodin.[34] (Id.).

Plaintiff underwent physical therapy on twelve occasions from September 2003 to November 2003 to improve shoulder range of motion and strength. (Tr. 247-49). Upon discharge it was noted that plaintiff had accomplished his goals in that he had normal range of motion of the right shoulder and demonstrated good functional ability with his shoulder. (Tr.

---

[32]Pulmonary infiltrates seen as transient migratory shadows on the chest x-ray, accompanied by blood. Stedman's at 602.

[33]The presence of an abnormally high concentration of lipids in the circulating blood. Stedman's at 1019.

[34]Vicodin is indicated for the relief of moderate to moderately severe pain. See PDR at 1502.

249).

Plaintiff presented to Winding Waters Clinic on October 21, 2003, at which time it was noted that plaintiff was doing well following shoulder surgery that he had undergone on August 15, 2003. (Tr. 274). Plaintiff's back and neck were also noted as doing well. (Id.). Plaintiff reported that his nerves and depression were "doing fine." (Id.). It was recommended that plaintiff continue his present regimen. (Id.).

Kenneth G. Mayfield, a Licensed Psychologist, performed a Psychological Evaluation with Cognitive Assessment on February 19, 2004. (Tr. 279-85). Plaintiff described himself as an "average student," and denied a history of special education. (Tr. 279). He reported that he graduated from high school and took several college courses. (Id.). Plaintiff indicated that he was a recovering alcoholic and drug addict and that he had been clean and sober for fifteen years. (Id.). Plaintiff reported that he had been diagnosed with depression in 1991 by his family doctor and that he had never been hospitalized for psychiatric treatment. (Id.). Dr. Mayfield found no evidence of a major affective disorder or significant cognitive deficit. (Tr. 281). He noted that plaintiff appeared to have no sense of direction and that he could possibly benefit from counseling. (Id.). Dr. Mayfield administered the WAIS-III, which revealed a Verbal Score of 88, a Performance Score of 77, and a Full Scale IQ of 81. (Id.). Dr. Mayfield stated that plaintiff had relative deficits in the areas of immediate auditory recall, awareness of visual detail, and visual motor speed and accuracy, and that plaintiff's remaining scores were within the borderline to low-average range. (Id.). Plaintiff was assessed as having "Borderline/Low-Average" intellectual

functioning.[35]  (Id.).  Dr. Mayfield assessed a GAF of 65.  (Id.).  Dr. Mayfield described plaintiff's level of daily functioning and ability to relate to others as "at least borderline intact."  (Id.).  He noted that there were, however, indications of considerable social isolation and some constriction of interests and habits.  (Id.).  Dr. Mayfield found that plaintiff is able to care for his basic personal needs, understand and follow verbal directions, and has no impairment in concentration or attention.  (Id.).  He concluded that plaintiff is able to cope with stress and pressures of routine work activities and is able to manage his own funds.  (Id.).

Joan Singer, Ph.D. completed a Psychiatric Review Technique on April 12, 2004.  (Tr. 150-63).  Dr. Singer found that plaintiff suffered from borderline/low average intelligence and depression, which are non-severe and do not satisfy diagnostic criteria.  (Tr. 151, 153).  Dr. Singer expressed the opinion that these impairments caused mild limitations in plaintiff's activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace.  (Tr. 160).  Dr. Singer indicated that plaintiff had not experienced any extended episodes of decompensation as a result of his impairments.  (Id.).

A state agency medical consultant completed a Physical Residual Functional Capacity Assessment on April 15, 2004.  (Tr. 164-72).  The medical consultant expressed the opinion that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull an unlimited amount of time.  (Tr. 165).  The medical consultant found that plaintiff had no postural, visual, communicative, or environmental limitations.  (Tr. 167-69).  The

_____

[35]Borderline Intellectual Functioning is defined by an IQ score that is higher than that for Mental Retardation, generally 71-84.  Mental Retardation is defined by an IQ score of 70 and below.  See DSM IV at 45.

medical consultant indicated that plaintiff had no manipulative limitations except that he was limited in his ability to reach in all directions, including overhead. (Tr. 168).

Plaintiff sought treatment at the Medical Arts Clinic from April 2004 to March 2005, after relocating to Missouri from Oregon. (Tr. 303-21). On April 20, 2004, plaintiff presented to Dr. P. Rana with complaints of chronic back pain and back spasms. (Tr. 303). Plaintiff indicated that he was in a fairly good state of health except for his back problems. (Id.). Plaintiff's gait and balance were intact and it was noted that plaintiff walked in at a normal pace and got on the examination table without difficulty. (Id.). Dr. Rana's assessment was chronic low back pain and history of degenerative disc disease. (Id.). Plaintiff was prescribed Ultracet[36] and Norflex.[37] (Id.). Plaintiff also underwent x-rays of the cervical and lumbosacral spine, which revealed mild scoliosis and degenerative disc disease of the lumbar spine. (Tr. 323). On June 1, 2004, plaintiff complained of mild low back pain. (Tr. 304). He reported that the Ultracet helped his neck pains significantly. (Id.). Plaintiff had full range of motion of the neck. (Id.). Dr. Rana's diagnostic impression was degenerative disc disease and status post cervical spine surgery and fusion of C-6, C-7. (Id.). Plaintiff was continued on Ultracet. (Id.). Plaintiff complained of right foot pain on June 8, 2004. (Tr. 305). X-rays of the foot revealed a first metatarsal bunion, previous amputation of second digit, and no visible acute abnormalities. (Tr. 324). Plaintiff was referred to a podiatrist. (Id.).

Plaintiff saw podiatrist Christopher T. Sloan on June 23, 2004. (Tr. 343). Dr. Sloan

---

[36]Ultracet is indicated for the short-term (five days or less) management of acute pain. See PDR at2509.

[37]Norflex is indicated for the relief of discomfort associated with acute painful musculoskeletal conditions. See PDR at 1667.

stated that plaintiff had noticeable pes planus[38] and calcaneal valgus.[39] (Id.). Dr. Sloan prescribed ibuprofen and molded arch supports for treatment of plaintiff's bilateral foot pain. (Id.).

On July 22, 2004, plaintiff presented to Dr. Rana with complaints of chronic low back pain that was not completely relieved with ibuprofen. (Tr. 304). Dr. Rana's assessment was chronic low back pain secondary to degenerative disc disease. (Tr. 307). Plaintiff was continued on Ultracet. (Id.). Dr. Rana noted that plaintiff was scheduled to follow-up with neurology. (Id.). On September 8, 2004, plaintiff reported that his neck pain still bothered him occasionally although it did not bother him at that time. (Id.). Plaintiff had full range of motion of the neck. (Id.). On October 11, 2004, plaintiff reported that his back pain was "doing OK." (Tr. 309). A physical examination of plaintiff's back revealed no tenderness with palpation. (Id.). Plaintiff indicated that he was moving to South Dakota and requested a note stating that he was required to take his dog with him on Greyhound Buslines for emotional support. (Id.). On January 3, 2005, plaintiff requested a referral to neurosurgery. (Tr. 314). Plaintiff indicated that he had seen a neurologist the previous week who had recommended surgery. (Id.). Plaintiff was given a referral to neurosurgery and medication refills. (Id.). On January 21, 2005, plaintiff complained of chronic back pain. (Tr. 317). Plaintiff requested an MRI of the spine. (Id.). Dr. Rana noted that x-rays performed in April of 2004 revealed degenerative disc disease and mild scoliosis. (Id.). Dr. Rana scheduled an MRI and refilled plaintiff's medications. (Id.). He also prescribed Vicodin. (Id.).

_____

[38]A condition in which the longitudinal arch of the foot is broken down, the entire sole touching the ground. Stedman's at 1356.

[39]A heel bone that is turned outward. See Stedman's at 1926.

Plaintiff underwent a cervical spine MRI on August 11, 2004, which revealed anterior spinal fusion of C6-7, mild diffuse bulge at C5-6 with right neural foraminal narrowing,[40] and bilateral mild neural foraminal narrowing at C4-5 from osteoarthritic changes. (Tr. 296).

Plaintiff underwent an MRI of the lumbosacral spine on February 2, 2005, which revealed degenerative disc disease throughout the lower lumbar spine and broad based disc bulge or protrusion at L2-3, with no spinal canal stenosis or neuroforaminal stenosis. (Tr. 300).

Plaintiff presented to Dr. Rana on February 11, 2005, complaining of abdominal discomfort. (Tr. 319). Dr. Rana noted that plaintiff had gone to the emergency room, where he was diagnosed with gastritis[41] and was given Zantac. (Id.). Plaintiff was found to be doing "quite well" with the Zantac. (Id.). He did not exhibit symptoms of weakness or focal neurological deficit. Id.

### The ALJ's Determination

The ALJ made the following findings:

1.  The claimant satisfied the disability insured status requirements of Title II of the Social Security Act on October 1, 2001, the date the claimant stated he became unable to work, and he continued to meet them through September 30, 2005.

2.  The claimant has not engaged in substantial gainful activity since October 1, 2001. The claimant's wages of $188.50 in 2002 were below the amount considered substantial gainful activity. 20 C.F.R. §§ 404.1574 and 416.974.

3.  The evidence establishes that the claimant has degenerative joint disease and bulging disc at L2-3; mild dextroscoliosis of the thoracic spine; residuals of an anterior fusion at C6-7 in 1990, mild bulging disc at C5-6, and degenerative joint disease at C4-5; bilateral rotator cuff tendonitis; residuals of a right acromioplasty with distal clavicle resection on August 13 2003; episodes of bursitis of both hips;

---

[40]Neural foraminal narrowing is the narrowing of the foramen, which is the opening in the spinal column through which spinal nerves pass. See Stedman's at 698, 1206,

[41]Inflammation of the stomach. See Stedman's at 731.

residuals of bilateral subtalar joint fusions, pes planus, and calcaneal valgus; dysthymia; and borderline/low average range intellectual functioning but the claimant does not have an impairment or combination of impairments of the severity required to meet or medically equal an impairment in the Listing of Impairments for 12 continuous months. 20 C.F.R. pt. 404, subpt. P, app. 1. The borderline/low average range intellectual functioning and dysthymic disorder cause mild restriction of activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence or pace (for skilled work, although the claimant can perform semi-skilled work), and no episode of decompensation of extended duration. 20 C.F.R. §§ 404.1520a ad 416.920a and 20 C.F.R. pt. 404, subpt. P, app. 1.

4.      The claimant's subjective complaints of disabling pain and restrictions were not credible for the reasons previously set forth in the hearing decision.

5.      The claimant has the residual functional capacity to perform work-related activities except for lifting and carrying more than 20 pounds occasionally and 10 pounds frequently.

6.      The claimant has the residual functional capacity for less than the full range of light work. 20 C.F.R. §§ 404.1567 and 416.967.

7.      The claimant is unable to perform his past relevant work as a ranch hand and newspaper deliverer.

8.      The claimant is presently 42 years old, which is defined as a "younger individual". 20 C.F.R. §§ 404.1563e and 416.963.

9.      The claimant has a 12th grade education, defined as a "high school education". 20 C.F.R. §§ 404.1564 and 416.964.

10.     The issue of transferability of acquired work skills is not material to the outcome in this case.

11.     Considering the claimant's age, education, work history, and residual functional capacity, 20 C.F.R. §§ 404.1569 and 416.969 and medical-vocational guideline rules 202.21 and 202.22 direct a finding of not disabled. 20 C.F.R. pt. 404, subpt. P, app. 2. The medical-vocational guideline rules take administrative notice of significant numbers of light work existing in the national economy and satisfy the burden of proof on the Commissioner of Social Security.

12.     The claimant was not under a "disability", as defined in the Social Security Act, at any time through the expiration of his insured status on September 30, 2005. 20 C.F.R. § 404.1520(g).

13.     The claimant is not "disabled" at any time.  20 C.F.R. § 416.920(g).

(Tr. 21-22).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based on the applications filed on February 2, 2004, the claimant is not entitled to a period of disability or disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act and he is not medically eligible for supplemental security income benefits under sections 1602 and 1614(a)(3)(A) of the Act.

(Tr. 22).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The

analysis required has been described as a "searching inquiry." Id.

**B.     The Determination of Disability**

To establish entitlement to Disabled Widow's Insurance Benefits, the following criteria must be met: (1) the claimant must have attained the age of 50; (2) the claimant must be the widow of the wage earner; (3) the claimant must be unmarried; and (4) the claimant must be under a disability as defined in the Act.  See 42 U.S.C. § 402(e)(1).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff raises two claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity.  Plaintiff next argues that the ALJ erred in failing to consult a vocational expert regarding plaintiff's borderline intellectual functioning.

## 1.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating his residual functional capacity.  Specifically, plaintiff claims that the ALJ's residual functional capacity determination is not supported by the medical evidence of record.  Defendant contends that the ALJ's residual functional capacity finding is based upon substantial evidence in the record as a whole.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 711-712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be

supported by *some* medical evidence.  See <u>Lauer</u>, 245 F.3d at 704.

The ALJ concluded as follows with regard to plaintiff's residual functional capacity:

[t]he Administrative Law Judge finds that the claimant has the residual functional capacity to perform work-related activities except for lifting and carrying more than 20 pounds occasionally and 10 pounds frequently.  That gives the claimant the benefit of some doubt.  That is the residual functional capacity for the full range of light work.[42]  20 C.F.R. §§ 404.1567 and 416.967.

(Tr. 20).

The ALJ's assessment of plaintiff's residual functional capacity is not supported by substantial evidence.  As support for his determination, the ALJ discussed plaintiff's testimony regarding his daily activities, as weighing against plaintiff's credibility.  Specifically, the ALJ noted that plaintiff testified that he could lift twenty pounds occasionally.  The ALJ rejected plaintiff's testimony that he could not lift twenty pounds on a consistent basis.  The ALJ noted that plaintiff admitted to performing odd jobs such as cleaning, mowing the lawn, and caring for dogs.  The ALJ concluded that plaintiff's activities of daily life include prolonged standing and walking, and are consistent with the ability to perform light work.  It has been held to be error for an ALJ to give more weight to non-medical evidence than to medical evidence.  See <u>Jeffcoat v. Bowen</u>, 840 F.2d 592, 596 (8th Cir. 1988).  In making a finding of residual functional capacity, however, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence.  See <u>Lauer</u>**,** 245 F.3d at 704 (emphasis added).

None of plaintiff's treating physicians expressed an opinion regarding plaintiff's functional

---

[42]Although the ALJ stated in the body of his decision that plaintiff had the residual functional capacity for the full range of light work, he stated in his Findings that plaintiff had the residual functional capacity for "less than the full range of light work."  (Tr. 21).  The ALJ did not provide an explanation for this discrepancy.

limitations. The only medical evidence regarding plaintiff's functional limitations consists of the opinion of the state agency medical consultant. The medical consultant expressed the opinion that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull an unlimited amount of time. (Tr. 165). The medical consultant also found that plaintiff was limited in his ability to reach in all directions, including overhead. (Tr. 168). This opinion is consistent with the ALJ's residual functional capacity determination, except that the medical consultant found that plaintiff was limited in his ability to reach in all directions. "The opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589).

The ALJ found that plaintiff suffers from a history of depression and borderline/low average intelligence, which cause mild restrictions in plaintiff's activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, and pace. (Tr. 18-19). This finding is consistent with the opinion of the non-examining state agency medical consultant, Dr. Singer. (Tr. 150-63). It is also consistent with the medical record.

The medical record reveals that plaintiff has sought treatment for depression since 1984. (Tr. 176-78). Plaintiff has been diagnosed with multiple different mental disorders, including adjustment disorder, possible major depression, possible formal thought process disturbance, possible personality disorder, possible borderline personality disorder, antisocial personality disorder, possible post traumatic stress disorder, generalized anxiety disorder, and dysthymia. (Tr. 177, 179, 189). Plaintiff was prescribed Paxil, which he indicated helped control his moods. (Tr.

262, 196). Although plaintiff was assessed a GAF score of 35 on October 10, 2002, this was due to plaintiff's separating from his wife at that time. (Tr. 196-97). On December 5, 2002, plaintiff indicated that he was experiencing very little depression. (Tr. 190). Dr. Trudel found that the Paxil was working fairly well for plaintiff and that plaintiff did not present a lot of depressive symptomatology. (Tr. 192). He indicated that plaintiff's difficulties were caused by his relationship with his wife. (Id.). Dr. Mayfield, an examining psychologist, found no evidence of a major affective disorder. (Tr. 279). Dr. Mayfield did, however, find indications of considerable social isolation and some constriction of interests and habits. (Tr. 281). Dr. Mayfield concluded that plaintiff was able to cope with stress and the pressures of routine work activities. (Id.). The medical record, therefore, is supportive of mild restrictions in plaintiff's activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, and pace.

With regard to plaintiff's intellectual functioning, the Wallowa Valley Mental Health Center administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) in December of 2002, which revealed a verbal IQ of 100 and a performance IQ of 78. (Tr. 192). On February 19, 2004, Dr. Mayfield administered the WAIS-III, which revealed a verbal scale IQ of 99, a performance scale IQ of 77, and a full scale IQ of 81. (Tr. 281). Dr. Mayfield diagnosed plaintiff with "Borderline/Low-Average" intellectual functioning and found that plaintiff's level of daily functioning and ability to relate to others was "borderline intact." (Id.). Plaintiff's IQ scores place plaintiff in the category of borderline intellectual functioning. See Hutsell, 259 F.3d at 709 n. 3 ("Borderline intellectual functioning is a condition defined as an IQ score within the 71-84 range while mental retardation is a score of about 70 or below.").

The ALJ, however, did not include any mental limitations due to plaintiff's depression or

borderline intellectual functioning in plaintiff's residual functional capacity. With regard to plaintiff's borderline intellectual functioning, the ALJ stated that, because plaintiff had "demonstrated the ability to perform semiskilled work with his lifelong intelligence, his intellectual functioning is not causing a significant work-related limitation." (Tr. 18). This finding is not supported by the record. The ALJ specifically noted plaintiff's "poor work history." (Tr. 19). Besides performing odd jobs in exchange for room and board, plaintiff's only past work experience consisted of working for his parents as a ranch hand and working on a part-time basis as a newspaper deliverer. The performance of these jobs can hardly be considered a demonstrated ability to perform semi-skilled work. Plaintiff's borderline intellectual functioning cannot be discredited on this basis. Similarly, although plaintiff may only have mild limitations due to his depression, it was error for the ALJ not to include these limitations in his residual functional capacity.

In sum, the residual functional capacity formulated by the ALJ is not supported by substantial evidence. The ALJ appears to base his determination solely on plaintiff's credibility. Although non-medical evidence such as plaintiff's testimony may be considered, the residual functional capacity finding must be supported by some medical evidence. In this case, the only medical evidence that addresses plaintiff's physical functional limitations is the opinion of the non-examining state agency medical consultant, which is not entirely consistent with the ALJ's determination. Further, the ALJ erred in failing to include plaintiff's limitations due to his mental impairments, namely his depression and borderline intellectual functioning.

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858

(8th Cir. 2000). The ALJ's residual functional capacity fails <u>Lauer</u>'s test that the residual functional capacity be supported by *some* medical evidence. <u>See Lauer</u>, 245 F.3d at 703. Thus, the ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace. Accordingly, the court will order that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new residual functional capacity for plaintiff, based on the medical evidence in the record and to order, if needed, additional medical information addressing plaintiff's ability to function in the workplace.

**3.      Lack of Vocational Expert Testimony**

Plaintiff argues that the ALJ erred by using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because plaintiff has a significant non-exertional impairment. Specifically, plaintiff argues that plaintiff suffers from borderline intellectual functioning. Plaintiff contends that the ALJ's use of the Medical-Vocational Guidelines, commonly known as the "Grids," to determine that plaintiff was capable of performing other work, was error. Plaintiff argues that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." <u>Gray v. Apfel</u>,

192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 26 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are nonexertional, and who therefore cannot perform the full range of work contemplated within each table." Id. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a nonexertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)).

The undersigned finds that the ALJ committed error by not eliciting the testimony of a vocational expert. The ALJ acknowledged that plaintiff suffers from borderline intellectual functioning and depression. As discussed above, the ALJ erred in failing to include plaintiff's limitations due to his borderline intellectual functioning and depression in plaintiff's residual functional capacity. "[B]orderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment that must be considered by a vocational expert." Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997). "While borderline intellectual functioning may not rise to the level of a disability by itself, a claimant is nevertheless entitled to have a vocational expert consider this condition along with his other impairments to determine how it impacts upon the claimant's residual functional capacity." Id. at 909.

The ALJ's finding that plaintiff's mental impairments would not limit his ability to perform

the full range of jobs contemplated by the Grids thus "invaded the province of the vocational expert" and was improper.  Sanders v. Sullivan, 983 F.2d 822, 824 (8th Cir. 1992).

Additionally, although the pain which plaintiff experiences may not, in itself, constitute a disabling condition, it is a non-exertional impairment and is to be considered by a vocational expert in his/her testimony concerning the influence of non-exertional limitations on plaintiff's ability to perform jobs in the national economy.  In paragraph 3 of his findings, the ALJ referred to plaintiff's degenerative joint disease and bulging disc at L2-3; mild dextroscoliosis of the thoracic spine; residuals of an anterior fusion at C6-7 in 1990, mild bulging disc at C5-6, and degenerative joint disease at C4-5; bilateral rotator cuff tendonitis; residuals of a right acromioplasty with distal clavicle resection on August 13, 2003; episodes of bursitis of both hips; residuals of bilateral subtalar joint fusions, pes planus, and calcaneal valgus.  (Tr. 21).  All of these conditions cause a certain amount of pain which, although they may be controlled by medications, still result in discomfort, a non-exertional limitation.  The plaintiff is entitled to have these conditions considered by the vocational expert in reaching his/her opinion.

Thus, the court will order that this matter be reversed and remanded back to the Commissioner in order for the ALJ to adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict his ability to perform jobs in the national economy.

## Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence.  The ALJ formulated a residual functional capacity that was not supported by substantial evidence.  Based on this erroneous residual functional capacity, he then applied the

Medical-Vocational Guidelines and determined that plaintiff could perform other work existing in significant numbers in the national economy. For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  14th  day of March, 2007.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE